Our second case on the call of the docket today is agenda number two, case number 109-102, People v. Martin. Counsel? Good morning, and may it please the court. Assistant Attorney General Michael Blankenheim on behalf of the people. The appellate court majority in this case reversed defendant's conviction for aggravated DUI on the ground that the people were required but failed to prove that the defendant's impaired driving approximately caused the death of the two victims in this case. The majority so held, even though it recognized that evidence of impaired driving was not required, to prove defendant guilty of the underlying DUI, driving with any amount of a drug in his blood, breath, or urine. That holding was error for two reasons. First, the plain language of the aggravated DUI statute does not require the people to introduce evidence of impaired driving. Instead, it requires evidence of approximate cause relationship between the underlying DUI violation and the victim's deaths. In this case, it's undisputed that evidence of impaired driving was not required to prove defendant guilty of violating Section 501A6, the Any Amount of a Controlled Substance DUI. And because the offense of aggravated DUI is defined with reference to that underlying DUI offense, whether impaired driving is relevant when you're enhancing a DUI violation to aggravated DUI, the elements of that underlying DUI violation determine whether impaired driving is relevant. Why, then, does the statute say, was the DUI violation's approximate cause of the death? That is the enhancement factor that the people need to prove, and the approximate cause element asks whether the defendant's active driving with the methamphetamine in his urine foreseeably resulted in the deaths of the two victims in this case. So, under the aggravated DUI statute, it's possible to have, there's a whole class of cases where a defendant commits a DUI violation and is involved in an accident that results in the deaths of another person. But it's not always going to be the case that the defendant's active driving foreseeably caused those deaths. In this case, it happened that the evidence was overwhelming that the defendant's active driving out of his lane of traffic into oncoming traffic and colliding head-on with the victims was both the but-for cause of the accident and the legal cause. Because that manner of driving foreseeably results in the deaths of the two victims in this case. And the defendant's argument that our position makes the approximate cause element of the statute meaningless, I think is best refuted by a hypothetical that the trial court posited at page 523 of the record. In that example, the trial court switched the facts of this case around so that the defendant, even though he was driving with a methamphetamine in his urine, he remained in his lane of traffic and obeyed all traffic and safety regulations, save the DUI statute. And the victim's car crosses into oncoming traffic, collides with the defendant's car, and the victims are killed. The trial court found that in that kind of hypothetical, the defendant's active driving would not be approximate cause of the deaths. Even though his driving would be a but-for cause, it's not foreseeable that driving in your own lane, obeying all kinds of traffic and safety regulations, that that manner of driving is going to cause the deaths of innocent persons. And to turn back to the appellate court majority's analysis, not only is it inconsistent with the plain language of the statute, but it also undermines the purpose of the aggravated DUI statute, which is to provide enhanced penalties when a DUI violation approximately causes the death of another driver. The General Assembly was motivated to pass the DUI violation at issue in this case based on its finding that it's infeasible to provide an objective measurement of the impairing effects of different kinds of drugs on different people. But the majority's rule that additional evidence of impaired driving is nevertheless required makes violations of 501A6 essentially ineligible for enhancement, because the very difficulties in proving impairment in drug driving cases becomes the reason why such crimes cannot be enhanced to aggravate a DUI. Turning first to the text of the aggravated DUI statute, the plain language of section 11-501D1F does not make impaired driving an element of aggravated DUI. Instead, it makes, it requires the people to prove the proximate cause relationship between the victim's deaths and the defendant's DUI violation. And given the express, given that aggravated DUI is defined with express reference to the underlying DUI violation, the court needs to look to the elements of that, excuse me, to that underlying DUI violation to determine whether impaired driving is going to be a relevant issue in the aggravated DUI context. Section 501A, the misdemeanor DUI statute, provides for a single offense, but it's an offense that can be committed six different ways. As we've outlined in our appellant's brief, four of those violations require evidence of impaired driving, and two do not. And one of those, and the DUI violation in this case, does not require proof of impaired driving. As this court recognized in People v. Fate, 501A6 is a categorical ban on all instances of drug driving without regard to the driver's physical impairment. And that statute, as I mentioned a bit earlier, was motivated by the General Assembly's finding that unlike drunk driving cases where you have the blood alcohol concentration measurement, there's no similar objective tool that will provide evidence of impairment given the vast number of illegal drugs and the different way those drugs can impair different people. So in this case, the trial court was correct when it held that the evidence of impaired driving was not required to enhance the underlying DUI violation to aggravated DUI. Instead, the focus of the proximate cause analysis was on the relationship between the defendant's active driving while there was methamphetamine in his urine and the resulting deaths in this case. And I'd like to turn at this point to the defendant's cross appeal. The defendant argues that the evidence was insufficient to prove him guilty of the underlying DUI violation of driving with any amount of methamphetamine in his urine. That argument should be rejected because some rational jury could have found that there was methamphetamine in the defendant's urine and that its presence there was attributable to the defendant's admitted use of that illegal substance. The people proved through the expert testimony of forensic toxicologist Kathy Anderson that defendant's urine contained methamphetamine. She testified that at the third test of a three-step testing protocol, she opined to a reasonable degree of scientific certainty that that test showed the presence of methamphetamine in her urine, excuse me, in the defendant's urine. That test was conducted with an instrument called a gas chromatography mass spectrometer, which Anderson explained provides what's basically a fingerprint for a drug. And her testing showed that the fingerprint of methamphetamine was present. The second element that the defendant's position, I'm trying to recall the facts, that other medications or other things placed into the system that could have methamphetamine in their urine. That test showed that the level of methamphetamine in the system, even though not anti-met, could show traces of met in the system, even though pure met was not ingested. That is the defendant's position. However, there's no record evidence to support that proposition. Is there anything to show that the level would indicate the opposite, that it must have been taken as pure met in order for those amount of traces to be shown? That's right. Viewed in the light most favorable to the people, Kathy Anderson's testimony demonstrates that the presence of methamphetamine in the defendant's urine was not due to a precursor substance, such as ephedrine or pseudephedrine. The third test that she performed on the GCMS instrument, she was looking for all drugs of the amphetamine class. That class includes drugs such as ephedrine and pseudephedrine, which are the two methamphetamine precursors that the defendant relies on. In this court, and even though she was looking for all drugs of that class, the only drugs she found were methamphetamine, amphetamine, and a drug called phenylpropanolamine, which is an ingredient in some cold medications. But she testified affirmatively that the PPA, the phenylpropanolamine finding could not explain the presence of methamphetamine. In additional evidence to rebut the defendant's argument that the presence of methamphetamine could be explained by his ingestion of a lawful substance is his admission to his best friend, Tiffany Graham, that he had used methamphetamine before. Tiffany Graham had raised money to help defendant pay off his medical bills, but she had received an anonymous phone call from the defendant. She had asked him how she could raise money for someone who had killed two people while on methamphetamine. She went to confront the defendant about that phone call, and he said, Tiffany, I've taken crystal meth before, but I wasn't on it that night. And additionally, he says, when Tiffany asks her, well, why am I getting this phone call, his response is, well, my drug tests came back positive. So that admission and the context in which it's made provides a reasonable inference that Tiffany Graham had used methamphetamine before. And that defendant ingested methamphetamine, and that the methamphetamine that the people's forensic expert found in his urine was a product of that unlawful use. Any time frame established when he did ingest meth? There was no precise time frame established for his last use, but Anderson's testimony provides somewhat of a rough time frame for understanding why, for understanding why she only found methamphetamine in the defendant's urine. She explained that a drug is first absorbed into the body through the blood, and as it works its way through the system, the last place that you'll find the drug would be in the urine. And so that's where she found methamphetamine in the defendant's system. So taking that sort of rough time frame for how a drug courses through a body, taking that with Tiffany Graham's testimony about defendant's admission, well, I've done methamphetamine before, but not on the night of the accident, a reasonable jury could view that evidence as meeting the people's burden under the misdemeanor DUI. Any evidence on the time frame that it takes for cold medication that could maybe produce small traces of meth to pass through the system as compared to when meth is taken and how long that takes to pass through the system? No. The issue of time frames for how various drugs or cold medications work through the body was not broached at all, either by the people's expert or by the defendant's expert. So if there are no further questions at this point, I'll save the rest of my comments for rebuttal. Ms. Bryson? Good morning, Your Honors. May it please the Court, Carrie Bryson for Erin Martin Counsel. This was a tragedy, no question. Two women lost their lives in a traffic accident and that is tragic. What it is not is criminal. Methamphetamine had nothing to do with this accident. Any trace amount of methamphetamine in the urine did not cause or even contribute to this accident. The State had the chance to show that it did and instead went to great pains to avoid even attempting to make such a showing. This accident was a result of the defendants being tired and nothing more. The State has stretched the aggravated DUI statute beyond its meaning and beyond reason in an effort to exact some form of vengeance for the deaths in this case, and that is improper. This is not a criminal matter, this is a civil matter. The issue before the Court, the primary issue on which Your Honors plan to leave to appeal, is one of statutory construction. And as Your Honors are well familiar with the general principles of statutory construction, the first place we look is to the plain language of the statute. The State's interpretation is based on a misreading of that plain language. The statute plainly states that a person is guilty of aggravated DUI if, in committing a violation of subsection A, he was involved in a murder or a robbery. This is not a motor vehicle accident that results in the death of another person when the violation was a proximate cause of the death. Now the State takes this statute and reads the violation language right out of it. The State's position would require that this Court rewrite the plain language of the statute to focus only on the driving. Throughout the proceedings, the State has taken the position that it need not prove any link between the violation, the methamphetamine in the defendant's urine, and the accident. This is the only way the State's interpretation can be upheld by rewriting the plain language of the statute. In fact, the State has argued that the difference between driving and driving with any amount of methamphetamine in the defendant's urine is a distinction without a difference when it comes to consideration of this statute. Yet looking at the plain language of the statute, it is a distinction that makes a world of difference. The plain language refers to the violation. What would the State have to prove under A-6 that there was any amount of drug in the urine? Nothing more. So if that's a violation, isn't that what ties into the State's arguments that a violation of subsection A is a proximate cause, that is, the violation itself without regard to the impairment causing the accident? But the violation includes the presence of meth in the defendant's system here in the urine. And that violation has to be a proximate cause of the accident. So without showing that there's any link between the methamphetamine and the accident and the resulting deaths, the State hasn't made that link. Yes, it establishes the underlying, the misdemeanor DUI violation, but the legislature saw fit in creating the aggravated DUI offense to include a proximate cause requirement that linked the violation with the accident and the deaths. And again, in this case, the State didn't even make any effort to show that it did, taking the position. Your position, dovetailing off of Justice Carmier's question, your position then is that there had to be some testimony that it was actually the meth in the system that contributed to the accident. But I'm interested in a further response to Justice Carmier's question. The offense was complete, right, once the defendant got behind the wheel, right? Because any level of meth in your system is enough to come under that portion of the statute, right? The DUI offense, yes. So we're in agreement then, he wasn't entitled to drive with meth in his system, and then while driving with meth in his system, he caused the death of two people, right? Right. So the violation of driving with the meth was a, why would you say that that would not be a proximate cause of the death of the two people? Well, I mean, it reads out, though, the violation part, because it's just the driving here that is the proximate cause. It was just the act of driving with or without the meth. So there has to be a link under the plain language of the statute referring to the violation, the violation including meth in the system has to be a proximate cause. The legislature phrased it as the violation, encompassing all of that, both the driving and the meth. So the entire violation has to be a contributing cause to the accident. Are you reading into the statute a requirement that the meth that caused his driving to be impaired, and there's no requirement for impairment under subsection 6? I'm not reading any, I think not reading anything into the statute. The defense is not, we're reading the statute as it is, the plain language, and the plain language refers to the violation which encompasses both the driving and the presence of the substance in the individual's system. The state is reading that out of the plain language. If the legislature had intended it to be just the act of driving that be the proximate cause, the legislature could have worded the statute differently, more simply, and could have said so in any number of different ways. In talking about proximate cause, the legislature could have simply said the person's driving is the proximate cause of the death. Or the person committed a violation of subsection A and was involved in a motor vehicle accident that resulted in the death. Or the person, while committing a violation of subsection A, caused a motor vehicle accident which resulted in the death. The legislature didn't choose any of that language. The legislature chose to link the violation and the death. What was the violation? Right, the violation is driving with any amount of substance in the urine. So if they prove that, isn't that the proximate cause? They prove the violation, they still have to prove that that violation links to the death, and that doesn't necessarily follow, because there's no showing that this had any impact. By including a proximate cause requirement and by referring to the violation, that encompasses the whole violation, not just the driving. The state wants, Your Honors, to look at just the driving. Ms. Bryson, are you saying the statute is ambiguous? I mean, I presented an alternative argument. I haven't argued that it's necessarily ambiguous. I think the plain language is clear and supports the argument we're making. If Your Honors find it ambiguous, certainly we can look to aides of statutory construction and even go beyond that with the requirement that the court interpret the statute in the defendant's favor. If it is ambiguous and the outside aides don't further lend any support to one interpretation or another. But I'd like to maybe take, for instance, an example that would illustrate how the state's interpretation can't really be what the legislature intended. Take, for instance, a situation where an individual is operating a vehicle with some sort of an equipment violation, like the taillights are out, you're driving down a dark road, no taillights on the car. Another, a second vehicle races up, doesn't see the defendant's car, the first car, slams into it, there's an accident, death, or injury result. Under the state's interpretation, if that driver of the vehicle with defective taillights is not otherwise driving the vehicle, the state's interpretation is that the driver of the vehicle with defective taillights is not otherwise driving the vehicle. So the defendant is in his own lane, driving at the right speed. He's still at fault. I mean, he's still an approximate cause of the accident and the injury and or death that would result. But, again, the violation has nothing to do with it. And that would be the same, no matter what the violation would be. You know, if the defendant were under A-1 or even say A-2, which the state tries to remove from this argument and carve out an exception for, you know, subsections 2 through 5. Even if under A-2 it was someone who was under the influence of alcohol driving that first vehicle with the defective taillights. Driving under the influence, even if he at that moment is operating his vehicle in his own lane at the speed limit, operating properly, but the equipment violation causes the accident, he's still at fault. And under the state's interpretation of the statute, also still guilty of aggravated DUI. I thought he said just the opposite. I thought he said that if there was no, if this accident had occurred by the victims coming across the center line, that there would have been no aggravated DUI. Right. And that is what they're saying with regard to that sort of circumstance. But say this is a victim who is, doesn't see the vehicle because the vehicle's taillights are on. I mean, that victim is still within his lane of traffic. The defendant is still within his lane of traffic. The equipment violation causes the accident. The equipment violation is, puts the defendant, the first driver, at fault. But his driving didn't do anything, you know, the manner in which he's operating his vehicle otherwise doesn't do anything. Under the state's interpretation, that is still a criminal offense. It's still an aggravated DUI. So to Justice Thomas' question about the fact that just getting behind the wheel impaired is a violation. That's a straight DUI violation. That's the underlying DUI, A6, that's the elements of that violation. And that's been established. But if he's not otherwise doing something to contribute to causing a motor vehicle accident, the violation isn't linked to the deaths. The violation isn't linked to the accident, the injuries, the deaths. But isn't that link made here? When he crossed the center line and hit these people? But there's no showing that the methamphetamine in this case had anything to do with that. You know, to trace them out, and, I mean, it's common. That's my question. Under your theory, we know that there has to be a showing of the impairment somehow that is the proximate cause. We know under fate that this Court has accepted the view that in terms of drug use, it can be very difficult to determine in an objective way how drugs relate to impairment. So what kind of evidence would the state have to show to prove impairment as you define it? Sure. I think the state could offer all sorts of evidence in that regard. I mean, we're not talking about the general underlying misdemeanor where there are a whole host of drugs and the legislature can't possibly classify each one at each level, you know, how it would affect across a broad spectrum of people. But in a particular case, the state could put on evidence of here's how much of a drug was found in the system. Here is what we know this drug, the effect of this drug to be on people generally. Here is what we observed of this. Isn't that the problem in fate? I mean, the discussion in fate was that the expert expertise of the medical world was such that they could not make that kind of determination. It's not that clear. It's not objective. I think in talking about just generally the driving offense and the whole variety of substances there may be, but now we're talking about a particular substance in a particular case, and we're talking about did it cause impairment. There's an additional requirement here, proximate cause. Did it cause, did it contribute to, did it impact the driving in such a way that it was the proximate cause of the deaths? So it would be just, the focus would be on, for example, the amount of the drug in the person's system, not how it affected the defendant's driving. No, I think it would be the amount of the drug, how it generally is known to affect people. I mean, I would submit that we know the effects of most drugs on people generally. What that defendant was observed to be doing, how he seemed after the accident. Were field sobriety tests administered, was the HGM test administered? Did he have slurred speech? Did he have glassy eyes? I mean, all these kinds of observations, the same kind of observations we make when we're talking about someone under the influence of alcohol applies to the drug. Across the board, I mean, there is all kinds of circumstantial observational evidence that could have been introduced. The state didn't go there. In this case, the state took the position it didn't have to. The state could go there to link a violation to the deaths, to the accident. I'm interested in going back for a minute to your statutory construction argument. A person shall not drive or be in actual physical control of any vehicle within this state while 6 then says you're on meth, right, basically. So how would you describe the violation in this case? I mean, the violation in this case was the driving with a trace amount of methamphetamine in the urine, as detected by the state's testing, which again, we've also disputed. So we're in agreement there. So the violation is driving with meth. That's the violation. The F now says, the aggravation says, when the violation of subsection A, which we were just talking about, was approximate cause of the death. So my question to you is, with your own wording of what the violation is here, how is the state reading into the statute and how are you complying with the statute? If the violation is driving with meth, doesn't the plain reading say a violation of driving with meth, and that's what we have here, if it was approximate cause of the injury? I think the state is reading out of the statute. They're reading out the with meth part of the violation. It's the whole violation. It's not just the driving. They're saying that this portion of the statute, there's a strict liability component to this portion of the statute. You drive with a trace of meth in your system, and under A6, that's the violation. Right, that's what this court has said. And if the driving with meth is approximate cause, if it's foreseeable that driving with meth in your system could cause the death of two people, if that's the approximate cause, then aggravation occurs. But there's no link here. I mean, there's no approximate cause. The meth has not been linked to what happened in this case. It's just the driving. The state has chosen to focus on just... That's why I'm asking you, are you reading into the statute here? Because all it says is the violation. The violation here is driving with meth. It doesn't say in addition, you have to prove every element of the violation is the approximate cause of the, it doesn't say that. It just merely says the violation. What else does violation mean? I mean, if you don't have to prove every element is approximate cause, why doesn't it just say driving was the approximate cause? It says violation, and that encompasses the whole violation, which is including the presence of meth in this case. If the legislature meant it to just be the driving, they would have and could have easily said that. Well, you keep saying just be the driving. It is the, the violation itself is the driving with meth in your system. Wait, but the state itself has taken the position that the meth in the system, that part, it doesn't matter, it's just the driving at this point. That's the state's position, and that reads out the rest of that violation as the approximate cause. And I think Merritt, the Fourth District case that was talked about in the briefs and by the appellate court is instructive here. You know, in Merritt, the defendant struck and killed a pedestrian while driving her vehicle in violation of both A1 and A2, which is the blood alcohol level and the under the influence. And the defendant urged that the accident was not her fault, that the pedestrian had run out in front of her and that it was not her fault. The court rejected that contention, noting that the defendant's impaired condition caused her to fail to take preventative action when she observed the victim enter the roadway. And in so holding, the Fourth District said the defendant's alcohol consumption impaired her driving ability, and thus her driving while under the influence was approximate cause of the victim's death. If, if it didn't matter that, you know, the violation itself had already been completed by showing that she was driving .08 or was driving under the influence, I mean, the argument is the same. The state tries to carve these out, these two through five, because those require impairment. But if it didn't matter whether the impairment affected the end result, if the impairment influenced or impacted the outcome here, which is the accident that resulted in death, it wouldn't have been necessary to consider that even in Merritt. Because the underlying violation would have been proved and there would have been an accident the court said was the defendant's fault. As in Merritt, I think the plain language should lead this court to conclude that it must be a causal connection between the violation and the death, not just the driving. If this court concludes that there's some ambiguity, that the plain language isn't clear, one way or another, you know, made an argument that the court should look to outside aids of interpretation, including statutory construction, aids like legislative history, and that that supports the interpretation, too, because the legislators were talking about intoxication as a cause. And alternatively, then, if you still find ambiguity, you know, statutory construction principles say interpret the statute differently. With lenity towards the defendants, in favor of the defendant. All, I would submit all of these ways of interpreting the statute result in the outcome that the defendant has put forth here, and that is that the violation, the driving with meth in the system must be linked to the death. I want to take a quick minute, I see my time's almost up, to talk about the second issue. And I want to specifically address a couple of the questions you asked, Justice Freeman. There are other things that can produce a positive test result for meth. There was no evidence here to show when the defendant last might have consumed methamphetamine, how long methamphetamine generally takes to metabolize through a system, how those other drugs that can lead to a positive result for methamphetamine, how long they take to get through the system. I mean, the state's trying to take this expert testimony, saying that it was in the urine, and that's where we know that meth, or any drug, was in the urine. And that any substance last is, when it's on its way out of the system, is in the urine. And work that back to say, well, that means that it was from the actual consumption of meth, except there's no, there was no timeframe evidence, there is no evidence about metabolization rates. We have this little, little amount that the defense expert disputes whether it should have even been marked as a positive result for meth, methamphetamine. And the state is trying to somehow show that some prior use at an unknown time caused that positive test result. We know there are other substances that can cause a positive result for meth, not a false positive. Was there any other evidence before the court, in this case, of any other precursor? There was some testimony about cold medicine, there wasn't, there was no expert testimony or other testimony that it was a specific substance. The expert for the state said that the other substances she detected would not produce a false positive for methamphetamine. And that I'd ask you to affirm the appellate court as to the first issue, and also reverse the appellate court on the second issue that we've submitted on cross-appeal. If there's no other questions, thank you. Mr. Blankenheim. Thank you. The people are not reading anything out of the aggravated DUI statute in this case. Our position has been since trial that the aggravated DUI statute requires a proximate cause relationship between a DUI violation and the victim's deaths. As my opponent has conceded, the violation of Section 501A6, the underlying DUI violation, was complete when he got in his car and drove while there was any amount of methamphetamine in his system. And our position does not read the methamphetamine out of the underlying DUI violation. Rather, our position is once, given the presence of methamphetamine in his urine, what would have been a lawful act of driving has been transformed into the unlawful act of driving with any amount of methamphetamine in his urine. Mr. Blankenheim, would you address the example given by Ms. Bryson about the equipment violation, the taillights being out, and a driver with meth in his system otherwise being in full compliance with the DUI? What's your position as to whether that's an aggravated DUI? In that case, I don't, given that the vehicle, that the taillights are broken, I don't know that that is defendant's fault, that that act of driving has proximately caused the victim's deaths. And to take perhaps another example, if there was some kind of defect in a vehicle that was unknown to the defendant, that could have caused the victim's death. If there was some kind of defect in a vehicle that was unknown to the defendant that occurred while he was driving, that kind of driving would not be a proximate cause either, because it's not, and I will leave it at that. And the reason why the General Assembly enacted the categorical ban on driving with any amount of methamphetamine in a driver's system is that it's too difficult to prove how the different kinds of controlled substances impair different kinds of drivers. So if you agree with the defendant's approach... But the observations at the scene can lend to supporting that the driver had been affected by whatever he's taken? In some cases, yes, but in some cases, no. And I think that's clear from the any amount DUI in this case, and also the .08 DUI in terms of drunk driving, it's possible for some drivers to mask signs of physical impairment. So the any amount DUI statute in this case, and the .08 BAC statute, provided another way, an important way of proving additional instances of drunk driving. And again, to require evidence of impaired driving for purposes of enhancing the underlying DUI to aggravate a DUI, that really is an absurd result, since the finding that motivated the General Assembly to pass the underlying DUI violation was that the DUI was not impaired. And so that becomes the chief difficulty to enhancing that violation when it has the most serious consequences, which is the deaths of innocent drivers. The defendant relies on people versus merit, but that case is easily distinguishable, given that the defendant was also charged with violating 501A2, which is the driving under the influence drunk driving statute. And that case illustrates the people's approach. That was a bench trial, and the trial court had found that the defendant's consumption of alcohol had impaired her ability to drive safely, and that her impaired driving was a proximate cause of the accident, since while sober drivers on the scene were able to take evasive actions, the defendant wasn't, because she was under the influence of alcohol. So that just shows that the elements of the underlying DUI violation determine whether evidence of impaired driving is relevant. And turning to the misdemeanor DUI violation, Anderson's testimony as a whole demonstrates the clear inference is that had defendant taken a substance such as ephedrine or pseudephedrine in a form other than an ingredient of methamphetamine, she would have found that substance when she conducted the third test in her three-phase protocol. Again, that was the amphetamine-specific test, using an instrument that provides what's essentially a fingerprint. Four drugs in that class, and the only drugs she found were methamphetamine, amphetamine, and PPA. And then to turn back to some of the questions, there's no record evidence whatsoever that some substance that defendant could have ingested lawfully would metabolize in his system as methamphetamine. The only evidence that defendant relies on is the Wikipedia article that wasn't found in the case, and that's the only evidence that can be considered in any event. If there are no further questions at this time, we'd ask you to reverse the appellate court's judgment that impaired driving is required for aggravated DUI, and affirm its judgment that the evidence was sufficient to prove the underlying DUI. Thank you. Thank you, counsel. Case number 109102, People v. Martin, will be taken under investigation.